IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ROBERT NOEL,  )  No. C 05-3514 MJJ (PR)
)
       Petitioner,  )
)  **ORDER DENYING PETITION**
  vs.  )  **FOR A WRIT OF HABEAS**
)  **CORPUS**
KELLY FARNEY, Parole Officer,  )
)
       Respondent.  )
_____ )

    Petitioner, a California parolee, filed this pro se habeas corpus petition pursuant to 28 U.S.C. § 2254. The Court dismissed three of the seven claims in the petition, granting petitioner leave to amend with respect to claims two and seven. As petitioner elected not to file an amended petition, claims two and seven were dismissed, and on November 1, 2005, respondent was ordered to show cause with respect to the four cognizable claims in the petition. Respondent filed an answer accompanied by a memorandum and exhibits contending that the petition should be denied. Petitioner filed a traverse.[1]

---

[1] In a January 30, 2007 motion for oral argument, an evidentiary hearing or a decision on the merits, petitioner asserts he is entitled to relief on his second claim based on Cunningham v. California, 127 S. Ct. 856, 871 (2007) (finding California's determinate sentencing law violates the Sixth Amendment because it authorizes the judge, not the jury, to find the facts permitting an upper term sentence). To begin with, petitioner's second claim concerns whether there had been a showing of proximate cause as to the death of the victim, and it does not in any way address petitioner's sentence, the Sixth Amendment, or any of the issues raised in Cunningham. Secondly, to whatever extent petitioner means to argue that Cunningham supports relief on his sixth claim, which was based on Apprendi and Blakely, such claim was dismissed because Apprendi and Blakely do not apply retroactively to cases on habeas review; nothing in Cunningham indicates otherwise. Finally, petitioner does not indicate he has exhausted any new, Cunningham-based claim in the state courts, as he must do prior to proceeding in federal court, nor could he have done so as Cunningham was decided only eight days before his motion was filed herein.

G:\PROSE\MJJ\HC.05\NOEL2.DNY.WPD

# BACKGROUND

The following facts are taken from the opinion of the California Court of Appeal:

> Diane Whipple (Whipple) lived with her domestic partner, Sharon Smith (Smith), on the sixth floor in the same San Francisco apartment building as defendants. Defendants, who were both attorneys, lived and operated their law practice out of their sixth floor, one and one-half bedroom apartment, which was down the hallway from Whipple and Smith. Defendants brought to their apartment a female Presa Canario named Hera in the spring of 2000. In the fall of that year, defendants brought a male Presa Canario named Bane to their home. The following winter, on January 26, 2001, at about 4:00 p.m., Knoller had taken Bane out of defendants' apartment and was returning to her apartment while Whipple was returning home with groceries. Whipple had unlocked her door, but never made it into her apartment before the Presas attacked her, killing her. What actually occurred is not clear from the record, but the record clearly establishes that Bane killed Whipple and Hera joined in the attack. The Presas had ripped off all of Whipple's clothing. The hallway carpet was soaked in blood, and streaks of blood covered the walls. Groceries and pieces of Whipple's clothing littered the hallway. Whipple had 77 discrete areas of injury, which covered her body "from head to toe." She died of multiple traumatic injuries and extensive blunt force trauma resulting in a loss of one-third of her blood.

People v. Noel, et. al., No. A099250, slip op. at 3 (Cal. Ct. App. May 5, 2005) (Resp. Exh. 6) (hereinafter "Slip Op.").[2]

A San Francisco grand jury indicted petitioner and his wife and co-defendant, Marjorie Knoller (Knoller), on charges arising from Whipple's death. The indictment charged petitioner with involuntary manslaughter (Cal. Penal Code § 192(b)) and ownership of a mischievous animal causing death (Cal. Penal Code § 399). (Id. at 4.) Prior to trial, the San Francisco Superior Court granted a change of venue to Los Angeles County. (Id.) The jury found petitioner guilty on both counts and the court sentenced petitioner to four years in prison for the involuntary manslaughter conviction. (Id. at 2, 48.)

The California Court of Appeal, First Appellate District, affirmed petitioner's convictions and sentence, and the California Supreme Court denied petitioner's application for review without prejudice pending final review of his claim of sentencing error. Petitioner's subsequent petition for a writ of habeas corpus was summarily denied by the California Supreme Court.

---

[2] A portion of this opinion is published at People v. Noel, 128 Cal. App. 4th 1391 (2005)

Petitioner raised four cognizable claims in his petition for habeas corpus: (1) the trial court's admission of gang association evidence violated petitioner's rights to due process; (2) convicting petitioner for involuntary manslaughter and owning a mischievous animal causing death violated the Double Jeopardy Clause of the Fifth Amendment; (3) petitioner's due process rights under the Fifth Amendment and a fair trial under the Sixth Amendment were violated because the trial court failed to instruct the jury on an element of the offense; (4) petitioner's Sixth Amendment rights to effective assistance of counsel and a fair trial were violated because the trial court precluded petitioner's co-defendant's lawyer from objecting during the prosecution's closing argument.

## DISCUSSION

**A.     Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under the 'contrary to' clause of 28 U.S.C. § 2254(d)(1), this Court may grant a writ if the "state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 413 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 412-13.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established

federal law erroneously or incorrectly." Id. at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. Id. at 409.

The standard of review is somewhat different if the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim.  In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. Plascencia v. Alameda, 467 F.3d 1190, 1197-98 (9th Cir. 2006).  When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law. Id.

Under 28 U.S.C. § 2254(d)(2), an unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence, central to Petitioner's claim, that was properly presented and made part of the state-court record. Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).  Where a state court has not made a necessary factual finding, the reviewing court determines the fact de novo. Wiggins v. Smith, 539 U.S. 510, 531 (2003).   A court must presume correct any factual determination made by a state court unless the Petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion, in this case that of the California Court of Appeal. Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).

**B.    Legal Claims**

    1.    Admission of Gang Association Evidence

Petitioner claims his due process rights were violated when the trial court admitted evidence regarding his alleged association with the Aryan Brotherhood prison gang.

The trial court held a California Evidence Code, section 402 hearing, in which it weighed the probative value of the evidence against it's prejudicial effect. (Slip Op. at 78-81.)  The trial court stated that whether the issue was "just dogs" or a "breeding program designed to benefit the Aryan Brotherhood" would be left to the jury to decide. (Id. at 81.)

The jury would determine "whether or not the Aryan Brotherhood played a role; if it did, what that role was as it relate[d] to the defendants' knowledge of the dogs that they ultimately had physical control over and that were involved in the death of Diane Whipple on January 26th, 2001." (Id.)  At trial, the court admitted evidence that petitioner corresponded with two prisoners who were members of the Aryan Brotherhood and were involved in a "business to purchase, breed, and train guard dogs for the benefit of the Aryan Brotherhood, with help from people outside the prison system." (Id.)  The prosecution's gang expert testified he believed petitioner and Knoller assisted in this business and were associates of the Aryan Brotherhood, who knowingly participated in criminal activity. (Id.)  The gang expert based his opinion on letters exchanged between petitioner and the prisoners. (Id.)  In particular, the expert testified about letters in which petitioner allegedly condoned the prisoner's stabbing of his attorney and in which petitioner revealed the location of two prosecution witnesses who were enemies of the Aryan Brotherhood. (Id. at 82.)

The trial court gave a limiting instruction regarding use of the evidence.  During Knoller's cross-examination, the court stated:

> Ladies and gentlemen, I want to caution the jury.  The relationship, if there was one--and it's up to the jury to determine--between Ms. Knoller and Mr. Noel and Mr. Schneider or Mr. Bretches or anybody else is relevant to the extent and only to the extent that information about the dogs, if you find that there was any information, became known to either Ms. Knoller or Mr. Noel.  The same thing with respect to the prison gang.  You will be instructed about this at the end. I believe you've been instructed already.  The prison gang itself, if you find that there is one--this is entirely up to you--is not relevant and nobody may be held accountable for anything that has to do with a prison gang, except to the extent that information about these dogs in any way that you find to be relevant was communicated to Mr. Noel and Ms. Knoller.  Nobody here is on trial for being a member of a prison gang and nobody is on trial for having a relationship with a person who is in state prison, and you many not consider that for it being a bad fact or anything along those lines.

(Id. at 83.)  At the end of the trial, the court gave this limiting instruction:

> [E]vidence regarding the Aryan Brotherhood, Pelican State--Pelican Bay State Prison, Mr. Paul Schneider and Mr. Dale Bretches has been admitted here. You may consider such evidence in determining whether the defendants Robert Noel and Marjorie Knoller either obtained from or sent to--obtained knowledge or sent knowledge about the dogs Bane and Hera or about Presa Canario dogs generally and then only to the extent that you find such knowledge is relevant to the crimes with which each defendant has been charged.

> You may not consider any evidence that you have heard regarding the Aryan Brotherhood, Pelican Bay State Prison, Paul Schneider or Dale Bretches for any purpose whatsoever except to the extent that you find it relevant to knowledge actually obtained from or sent by the defendants Marjorie Knoller and/or Robert Noel about the dogs in this case or about Presa Canario dogs generally. If you find that the defendants did not obtain or send any information about the dogs Bane, Hera or about Presa Canario dogs from any communications with either Mr. Schneider and/or Mr. Bretches, then you are instructed to disregard in its entirety any evidence you may have heard regarding the Aryan Brotherhood, regarding Pelican Bay State Prison, regarding Paul Schneider or regarding Dale Bretches.
>
> Under no circumstances, regardless of which way you come down, may you consider evidence of the Aryan Brotherhood, Pelican Bay State Prison, Mr. Paul Schneider or Mr. Dale Bretches to be evidence of the character of the defendant Marjorie Knoller or Robert Noel.

(Id. at 83-84.)

The appellate court affirmed the trial court's admission of the evidence. (Id. at 88.) The appellate court stated that the Aryan Brotherhood evidence was not only relevant to petitioner's knowledge of the dogs' violent dispositions, but "was necessary to connect all of the players, to establish intent and motive, and to counter the defense at trial." (Id.) In discussing the evidence as related to Knoller, the court stated:

> [T]his was not simply a dog case. This was a case where two attorneys, claiming to be doing pro bono work, became involved with inmates who had started a Dog-O-War breeding business that was funded by a settlement from a lawsuit by another inmate who was a member of the Aryan Brotherhood. Evidence of the Aryan Brotherhood was not only necessary to link defendants to the inmates but also to connect them to Storey, who was the person who hired defendants to retrieve the dogs from Coumbs's property. Storey's connection to the inmates was explained by Hawkes; he opined that she was an associate of the Aryan Brotherhood. Thus, the money for the breeding business, the players in the breeding business, defendants' connection to and participation in the naming of the breeding business, the literature highlighting the ferociousness of the dogs that was found in defendants' apartment, and the choice of breeding Presa Canarios could only be explained through the gang connection. Thus the Aryan Brotherhood evidence was necessary to connect all of the players, to establish intent and motive, and to counter the defense at trial.
>
> We therefore reject Knoller's contention that the trial court's admission of evidence of the Aryan Brotherhood was inadmissible character evidence constituting an abuse of discretion and a violation of her federal due process rights. The trial court found that the prosecution had established an adequate foundation and the record supports this ruling. The evidence was not cumulative of any other evidence introduced on the issues of Knoller's motive and intent. Knoller's connection to the Aryan Brotherhood was directly relevant and probative as to why she, an attorney, had the Presas and why she kept them even after they had lunged at people and even after she was having problems controlling them. Further, it connected her to the literature found in her home, such as Manstopper.

> The prejudicial effect of this evidence was not outweighed by its probative value, since such evidence was highly relevant. The court limited the evidence presented, and it was Knoller's own attorney who delved into the racist ideology of the Aryan Brotherhood. Moreover, the trial court properly instructed the jury on the limited purposes for which it was admitting this evidence. Accordingly, we conclude the trial court did not abuse its discretion in admitting evidence of the Aryan Brotherhood. Knoller's claims of federal constitutional error, "entirely dependent as they are on [her] claim of state law error, likewise must fail." (People v. Carter (2003) 30 Cal.4th 1166, 1196 [135 Cal. Rptr. 2d 553, 70 P.3d 981].)

(Id. at 88-89.)  The appellate court similarly rejected petitioner's due process claims.  (Id. at 119.)  ("For the same reasons already specified in the discussion of Knoller's appeal, we reject Noel's contention that this evidence was irrelevant and that the court erred or abused its discretion in admitting it").  Further, the appellate court held that the evidence did not prejudice petitioner because the evidence against him was "overwhelming."  (Id. at 120.)

> Noel, himself admitted that Knoller was unable to control the Presas and he was present during many of the 30 incidents where the Presas broke away from Knoller and ran into the hallway. Thus, his act of leaving Knoller alone with the Presas, with full knowledge of their dangerous propensities and of Knoller's inability to control them, amply supported his convictions for violating sections 192, subdivision (a), and 399.

(Id.)

A state court's admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999).  Even if the admission was improper under state rules of evidence, a habeas petitioner is only entitled to relief if the admission of evidence was arbitrary or so prejudicial that his trial was rendered fundamentally unfair as to violate his constitutional rights.  Butler v. Marquez, 758 F.2d 373, 378 (9th Cir. 1985).  Due process is violated only if there are no permissible inferences the jury may draw from the evidence.  Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).

This court cannot find that the admission of gang evidence rendered petitioner's trial so fundamentally unfair as to violate his due process rights.  The Ninth Circuit has permitted the admission of gang evidence when used to establish something other than the character of the defendant.  See United States v. Abel, 469 U.S. 45, 54 (1984); United States v. Hankey,

203 F.3d 1160, 1172 (9th Cir. 2000); United States v. Santiago, 46 F.3d 885, 889 (9th Cir. 1995). The evidence countered petitioner's contention that he simply wanted to "rescue" the dogs from a bad environment. The evidence also explained why petitioner and Knoller, as attorneys, "had the Presas and why [they] kept them even after they had lunged at people." (Slip Op. at 86, 89.) Because the jury could have drawn the permissible inference that the gang evidence established petitioner's motive and intent, his constitutional rights were not violated.

Petitioner's reliance on Dawson v. Delaware, 503 U.S. 159 (1992) in his traverse is inapposite. In that case, the Supreme Court held the admission of the following stipulation was improper: "the Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware." Id. at 162. The Court held the narrow stipulation "left the Aryan Brotherhood evidence totally without relevance to Dawson's sentencing proceeding" because the evidence submitted was not tied to the murder of the defendant's victim. Id. at 165. However, the Court held that if the submitted evidence showed "that the Aryan Brotherhood is a white racist prison gang that is associated with drugs and violent escape attempts at prisons, and that advocates the murder of fellow inmates," that evidence would have been relevant and admissible. Id. at 165. The evidence submitted in petitioner's case was relevant and admissible because it was tied to petitioner's motive and intent in keeping the violent dogs. (Slip Op. at 86, 89.)

Morever, the trial court's admonishments to the jury regarding the proper use of the evidence is a strong indicator that petitioner's due process rights were not violated. Juries are presumed to follow a court's limiting instructions with respect to the purposes for which evidence is admitted. Zafiro v. United States, 506 U.S. 534, 540 (U.S. 1993). Evidence of gang involvement is also not so incriminating that juries would stray from their duty to follow instructions. See United States v. Hankey, 203 F.3d 1160, 1175 (9th Cir. 2000) (district court did not abuse its discretion in admitting gang evidence, particularly in light of a limiting instruction to the jury). The trial court's continuous instructions to the jury that they

could only consider the evidence insofar as it related to petitioner's knowledge about the dogs and "only to the extent that you find such knowledge is relevant to the crimes with which each defendant has been charged" presumptively cured any potential misuse of the evidence. (Slip Op. at 83-94.)

Finally, the court of appeal held that a constitutional error, if any, was harmless because "[petitioner's] act of leaving Knoller alone with the Presas, with full knowledge of their dangerous propensities and of Knoller's inability to control them, amply supported his convictions." (Slip Op. at 89, 120 (citing Chapman v. California, 386 U.S. 18, 24 (1067) (constitutional error must be harmless beyond a reasonable doubt)). Under AEDPA, if the state court disposed of a constitutional error as harmless under an appropriate standard of review, federal courts must, for purposes of application of the "unreasonable application" clause of §2254(d)(1), first determine whether the state court's harmless error analysis was objectively unreasonable. Medina v. Hornung, 386 F.3d 872, 878 (9th Cir. 2004). If the federal court determines that the state court's harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly established federal law, the federal court then proceeds to the harmless error analysis under Brecht v. Abrahamson, 507 U.S. 619 (1993). Id. at 877.

Here, the court of appeal's harmless error analysis was not contrary to established Supreme Court precedent since it correctly identified that constitutional errors had to be harmless beyond a reasonable doubt pursuant to Chapman. The state court holding was also not objectively unreasonable. For the reasons described by the court of appeal, the evidence supporting petitioner's convictions was very strong. (Slip Op. at 120.) Evidence gathered from petitioner's home and testimony from multiple witnesses, also showed petitioner understood and appreciated the dangerous nature of his dogs. (Slip Op. at 8-22, 35-36.) In fact petitioner himself had been bitten by one of his dogs and was hospitalized for four days and had two steel pins placed in his hand. (Id. at 17.) For the same reasons, after independent review, the admission of Aryan Brotherhood evidence did not have a substantial and injurious effect or influence in determining the jury's verdict, pursuant to Brecht.

Accordingly, petitioner is not entitled to habeas relief on this claim.

2. Double Jeopardy

Petitioner asserts his convictions for involuntary manslaughter (Cal. Pen. Code, § 192(b)) and owning a mischievous animal causing death (Cal. Pen. Code, § 399) violated his Fifth Amendment right not to be placed twice in jeopardy for the same offense.

Petitioner asserts that "the mischievous animal statute was a specific statute which prevailed over and precluded imposition of liability for involuntary manslaughter." Whether the California legislature intended for the mischievous animal statute, section 399 to preclude the involuntary manslaughter statute, section 192 is a question of state law. The appellate court held that the legislature did not intend for section 399 to preclude section 192 because section 399 requires proof only that a defendant did not use ordinary care in keeping a mischievous animal, whereas section 192 requires the higher degree of criminal negligence to establish liability. (Slip Op. at 122) ("If the prosecution has to prove a higher degree of culpability for one of the offenses, then preclusion does not apply") (citing People v. Watson, 30 Cal. 3d 290, 297 (1981)). The state court's determination on this issue of state law is binding on this court. Hicks v. Feiock, 485 U.S. 624, 629 (1988)

With respect to petitioner's federal double jeopardy claim, the Double Jeopardy Clause of the Fifth Amendment guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V.; Benton v. Maryland, 395 U.S. 784 (1969) (protections were held applicable to the states through the Fourteenth Amendment). The guarantee against double jeopardy protects against multiple punishments for the same offense. Witte v. United States, 515 U.S. 389, 395-96 (1995)[3].

---

[3] Because the state appellate court dismissed petitioner's claim on the preclusion principle, this court conducts an independent review of the record to determine whether the state court's decision was an unreasonable application of the law. Plascencia, 467 F.3d at 1197-98 (if the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable).

In determining whether one action violates two statutory provisions, this court follows the test established in Blockburger v. United States, 284 U.S. 299, 304 (1932). "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." Id.

This court compares the elements of involuntary manslaughter to the elements of owning a mischievous animal causing death to determine whether they constitute two separate offenses under Blockburger. Liability for involuntary manslaughter requires that a person act "without due caution and circumspection." Cal. Pen. Code, § 192(b). In other words, something more than ordinary negligence is required as a basis for involuntary manslaughter - the defendant must act with "criminal negligence." People v. Penny, 44 Cal. 2d 861, 879 (1955). The negligence must be "aggravated, culpable, gross or reckless, that is, accused's conduct must be such departure from what would be conduct of ordinarily prudent or careful man under same circumstances as to be incompatible with proper regard for human life, or, in other words, a disregard of human life or indifference to consequences." Id. Liability under California Penal Code, section 399 requires "the owner[4] of a mischievous animal, knowing its propensities, willfully suffers it to go at large, or keeps it without ordinary care, and the animal, while so at large, or while not kept with ordinary care, kills any human being who has taken all the precautions that the circumstances permitted, or which a reasonable person would ordinarily take in the same situation, is guilty of a felony."

Under California law, involuntary manslaughter due to criminal negligence under Section 192(b) requires proof of facts which need not be proved when the charge is owning a mischievous animal causing death under section 399, and vice versa. Involuntary manslaughter requires proof of criminal negligence, while owning a mischievous animal only

---

[4]Statute amended in 2001 to read: "If any person owning or having custody or control of a mischievous animal, knowing its propensities, willfully suffers it to go at large, or keeps it without ordinary care, and the animal, while so at large, or while not kept with ordinary care, kills any human being who has taken all the precautions that the circumstances permitted, or which a reasonable person would ordinarily take in the same situation, is guilty of a felony."

requires proof of care below "ordinary care." Section 399 requires proof of owning a mischievous animal, while association with an animal is completely irrelevant to the involuntary manslaughter analysis. If an owner of a mischievous animal acted with ordinary negligence and the animal killed someone, he would be guilty of violating section 399 but not involuntary manslaughter. Contrarily, if a person borrowed an animal and acted so recklessly as to show a total disregard for human life that the animal killed someone, he would be guilty of involuntary manslaughter but not section 399, because he was not the owner. Consequently, sections 192(b) and 399 require different elements of proof and petitioner's conviction of both offenses does not violate Double Jeopardy under the Blockburger test.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 3. Instructing the Jury on Elements of the Offense

Petitioner contends his Fifth and Sixth Amendment rights were violated because the trial court did not instruct the jury on the elements of the offense charged. Specifically, petitioner contends that the trial court did not define the word "owner" in California Penal Code, section 399, which penalizes the "owner" of a mischievous animal. Petitioner contends that the word "owner" has a technical meaning, which departs from the ordinary meaning, although petitioner himself does not state what that technical meaning is.

The trial court instructed the jury, pursuant to CALJIC No. 12.97, that "in order to prove such a crime, each of the following elements must be proved: one, a person owned a mischievous animal . . ." (Slip Op. at 123.) The trial court then properly clarified the term "mischievous": "the word 'mischievous' means those propensities that may naturally pose a risk of harm or injury to others." (Id.) See Sea Horse Ranch v. Superior Court, 24 Cal. App. 4th 446, 460 (1994) (clarification required of what constitutes a "mischievous animal); People v. Berry, 1 Cal. App. 4th 778, 786 (1991) (although the definition of "mischievous" given to the jury was overbroad, the instructional error was harmless under any standard).

The California courts have not found "owner" to be an ambiguous term and the appellate court in this case conclusively determined that the word "owner" is commonly

understood. (Slip Op. at 125.) This court agrees with the court of appeal's determination that"owner" is a commonly understood term that need not be further defined in the jury instructions. Consequently, the trial court's failure to define the term did not so infect the entire trial that the resulting conviction violated due process. See Estelle v. McGuire, 502 U.S. 62, 72 (1991).

The failure to define "owner" was, moreover, harmless. Neder v. United States, 527 U.S. 1, 8-11 (1999) (a jury instruction that omits an element of an offense is constitutional error subject to harmless error analysis). Substantial evidence supported the conviction under section 399. Evidence was presented that petitioner designated himself and Knoller as the "owner" and "co-owner" of the dogs when he purchased their licenses. (Slip Op. at 125.) Petitioner stated in a press conference that he and Knoller were "legal owners" of the dogs. (Id.) Petitioner and Knoller cared for the dogs and exercised complete control over them. (Id.) Therefore, if the trial court had formally instructed the jury on the meaning of "owner," the jury would have found petitioner to be the dogs' owner.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 4. Assistance of Counsel

Petitioner contends he was denied effective assistance of counsel because the trial court precluded his lawyer from objecting to "egregious prosecutorial misconduct" during the prosecution's rebuttal argument after petitioner's closing statement. Petitioner asserts that the prosecution's improper statements coupled with the trial court's statements in front of the jury denied him a fair trial.

The following facts are taken from the appellate court's opinion:

> The prosecution and counsel for both Knoller and Noel presented their closing arguments to the jury without any significant infringement on their arguments by the trial court. However, after the prosecution had given a little more than one-third of its rebuttal closing argument, Ruiz, Knoller's attorney, objected on the basis that the prosecutor had misstated the evidence. The court admonished counsel that this was closing argument and told her that "[t]here will be no further interruptions or you will be out of the courtroom."
>
> Subsequently, the prosecution argued: "The evidence, and it's uncontradicted, is that time and time again they were warned wear a muzzle, put a choke collar on and they said in Mr. Noel's words I can do whatever I god damn please, I can go to any park I

want with the dog off-leash." Counsel for Knoller objected, stating "the dog was on leash at all times." At this point, the prosecution had made more than three-quarters of its rebuttal closing argument.

The court reprimanded Ruiz and stated the following: "Counsel, there will be no further objections. The jury will recall the evidence.

"Ladies and gentlemen, it is improper and counsel's conduct is improper by standing up in closing argument and objecting to her recollection of what the evidence was. The jury will recall what the evidence is. Arguments of counsel are not evidence and it is improper.

"And, Ms. Ruiz, please take your seat now and not get up again or the next objection will be made from the holding cell behind you.

"Ladies and gentlemen, counsel are entitled to argue what they believe the evidence is. If they are wrong, the jury will recall that. What counsel say the evidence is, is not the evidence. And it is not a proper objection to stand up in the middle of closing argument and insert your own interpretation of what the evidence is."

Neither Ruiz nor the attorney for Noel objected during the remainder of the prosecution's closing rebuttal argument.

After the trial concluded, at the hearing on the motion for a new trial, the court considered the issue that its order to Ruiz to refrain from objecting any further supported a deprivation of counsel claim. The court explained: "This is not on the record and I am putting it on the record now for this reason. The way the courtroom in Los Angeles is set up, it's a very big court, a large room, much wider than this one. The jury box is over to my right, to your collective left and the way the tables were set up, Ms. Ruiz and her client were over to my left so that when you look at the jury box, you can't see them. Your back is turned, you have to physically turn.

"During the course of [the prosecutor's] rebuttal on March 19th, where I was watching them, the Court had caught--and this was independently verified by security staff down in Los Angeles. I was caught by a substantial amount of noise coming from the defense table and I looked over and Ms. Knoller and Ms. Ruiz were engaged in a very animated discussion with a lot of waving of hands which included on the part of Ms. Knoller the 'Get up, get up, get up,' the waving of arms going up like that (indicating) and suddenly in the middle ... . Ms. Ruiz for perhaps the second time in the trial did not make a speaking objection. She simply stood up and said 'Misstates the evidence.' It's the Court's view that was an improper objection. The evidence that she was talking about was virtually impossible to identify and it was the Court's view--and this was independently corroborated by security staff, ... who was so concerned about the amount of noise that he got up to stand over there because he was afraid that something was going to happen. The waving of hands, the 'stand up,' it appears to this court that this was an objection inserted into the record for the purposes of interrupting the flow of the prosecution's rebuttal argument and nothing more than that. [P] ... [P]

"This was a second objection which appeared to the Court more to be--more designed to interrupt the flow of the prosecution's rebuttal argument than anything else. And the Court was quite stern with Ms. Ruiz. The Court indicated that there would be no further objections. I wish I had inserted the word 'improper' in there, I didn't, but my description to the jury afterwards of why it is not proper for counsel to stand up in the middle of an argument and dispute a rather small technical point of evidence, I certainly suggested that Ms. Ruiz remain in court and was free anytime under the

>obligation to insert whatever objections she deemed appropriate on behalf of her client. She was never removed. And this should be considered a compliment to Ms. Ruiz. I do not believe that she would be at all cowered into silence by any of my comments made from the bench."

(Slip Op. at 102-104.)

After the court's admonition, the prosecution made the following statement:

>Last thing I want you to think about, please, because this is a murder case and you try to recreate Diane Whipple's time in that hallway, what is it she saw before that first bite? ... [P] Mr. Noel writes 'Before I could get my body in the doorway to block them, they pushed forward into the hall and took off side by side down the hall toward the elevator in a celebratory stampede.' Think of Diane. '240 pounds of Presa wall-to-wall bouncing off and heading for the wall at the end of the hall.' Exactly where Diane was standing before she was bitten by these dogs.

>Think about the ten minutes that she was ripped to death and her clothes ripped off her and then think about this because this is how she died because of their recklessness. Every time she tried to breathe, think of a breath in. Every time she tried to breathe, her throat closed in on itself, every time. And she crawled, this young woman despite her ... try to get home and she tried to breathe again and her throat closed in again. She tried to breathe again and she was alone, she was alone unable to even talk. And the dog was still running loose with her and she tried to breathe again, and her voice closing down with two holes in her larynx and she crawled and she tried to push herself up and she crawled some more to try to get home and no one was there, no one. That's what these people's recklessness did, caused that kind of death.

(Slip Op. at 114-115.)

The appellate court found that "even if we presume the court's comments that were directed to Knoller's attorney also had effect on Noel's attorney, we reject the argument that this deprived him of his Sixth Amendment right to counsel for all of the same reasons that we rejected Knoller's similar claim." (Slip Op. at 126.) The appellate court held that the trial court's admonition did not violate petitioner's constitutional rights because it did not constitute a complete denial of counsel at a critical stage in the proceeding and therefore did not warrant per se reversal. (Slip Op. at 104-106.)

The trial court's admonition to Knoller's counsel did not violate petitioner's Sixth Amendment rights. A complete denial of counsel during a critical stage in the proceeding is a structural error requiring per se reversal, whereas all other alleged errors must prejudice the defendant and be viewed in light of its effect on the fairness of the trial. United States v. Cronic, 466 U.S. 648, 662 (U.S. 1984). Situations where the courts have found that defendant was denied counsel during a critical stage of the proceedings are rare. Id.; Geders

v. United States, 425 U.S. 80, 91 (1976) (order preventing petitioner from consulting his counsel "about anything during a 17-hour overnight recess between his direct- and cross-examination impinged upon his right to the assistance of counsel guaranteed by the Sixth Amendment); Herring v. New York, 422 U.S. 853, 865 (1975) (petitioner was denied effective assistance of counsel when the trial court precluded his counsel from making a closing statement). In addressing a trial court's discretion to limit closing argument, the Supreme Court has stated, "This is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained. The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects he must have broad discretion." Herring, 422 U.S. at 862.

 To begin with, the trial court forbade Knoller's attorney, not petitioner's, from objecting. The trial court's prior holding that an objection from counsel for one defendant would be considered an objection by both unless otherwise noted does not compel the conclusion that a warning from the bench to one attorney would also apply to the other attorney. Second, as the appellate court found, the trial court's admonition of Knoller's counsel and threat to place her in a holding cell resulted only after Ruiz had repeatedly engaged in inappropriate conduct throughout the trial and had already received many warnings from the bench to curb her improper behavior. (Slip Op. at 113.) As such, it appears that the trial court here was simply exercising its discretion to control the courtroom. Id. Moreover, the admonition was not made until the prosecutor had already completed the entire closing argument and the majority of the rebuttal. In sum, the admonition, which on its face was not directed at petitioner's attorney and came near the very end of the prosecution's rebuttal, cannot be said to have completely denied petitioner counsel during a critical stage of the proceedings. The appellate court's finding that petitioner was not denied counsel during

a critical stage in the proceedings and that a per se reversal was not warranted, was not contrary to, nor an unreasonable application of, federal law.

Because petitioner was not denied counsel during a critical stage in the proceedings, he must show that he was prejudiced by the admonition to Knoller's attorney. Strickland v. Washington, 466 U.S. 648, 694 (1984). Petitioner contends, "[t]he Court's muzzling of Petitioner's and his co-defendant's counsel permitted the prosecutor to violate black letter law that a prosecutor may not ask a jury to consider a crime through the eyes of the victim." (Pet. at Attachment B 12.) However, petitioner has not asserted that his attorney would have objected absent the court's admonition to Knoller's attorney.

The appellate court found the prosecutor's statements were not simply an appeal to the jury to consider the suffering of the victim, but rather a request that the jury recreate the scene in the hallway. (Slip Op. at 116-17.) The appellate court held although the statement, "think of Diane," was an appeal to consider the crime through the eyes of the victim and was improper under state law, the statement was not too prejudicial and did not warrant reversal. (Id.) As the appellate court reasonably found, "even if the prosecutor committed misconduct under California law, that misconduct was not prejudicial because it is not reasonably probable a result more favorable to the defendant would have occurred had the prosecutor not made his remarks . . . the evidence of [defendant's] guilt was overwhelming." (Id. at 117) (citation omitted). For the same reason, namely that, as discussed supra, considerably strong evidence supported petitioner's conviction, there was no reasonable probability that, if counsel had objected to the prosecutor's comments, the factfinder would have had a reasonable doubt as to his guilt. Consequently, petitioner has not shown that counsel's purported inability to object to the prosecutor's remarks was prejudicial to the outcome of the trial under Strickland.[5]

---

[5] In a motion filed February 21, 2006, petitioner requested an evidentiary hearing "to take the testimony of Bruce Hotchkiss, Esq." on this claim. On January 30, 2007, petitioner has filed a second request for an evidentiary hearing in which he states that Mr. Hotchkiss will "shortly" be moving to the Phillipines and thus would be unavailable for an evidentiary hearing. Petitioner does not present a sufficient basis for the evidentiary hearing he requests. First, he does not make the necessary showing

Accordingly, petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The clerk shall close the file and terminate all pending motions.

IT IS SO ORDERED.

DATED:   5/29/2007

_____
MARTIN J. JENKINS
United States District Judge

---

under AEDPA of the violation of a "new rule" of constitutional law, due diligence, or actual innocence. See 28 U.S.C. § 2254(e)(2). Second, petitioner does not describe or suggest what testimony Mr. Hotchkiss would provide, and as a result, it cannot be determined whether such testimony would be helpful to petitioner's claim. In any event, even if Mr. Hotchkiss were to testify that he would have objected to the prosecutor's comments but for the trial court's admonition, petitioner would not be entitled to relief because the court has already determined that the prosecutor's comments were not prejudicial. Davis v. Woodford, 384 F.3d 628, 641-43, 647-50 (9th Cir. 2004) (upholding denial of evidentiary hearing as to claims because they did not present prima facie grounds for relief).